**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

GEORGIOU FAMILY TRUST *et al.*,    :
                              :
        Plaintiff,    :
                              :
        v.    :    CASE NO.: 1:22-CV-00147 (WLS)
                              :
PHILLIP V. RUTHEN *et al.*,    :
                              :
        Defendants.    :
_____:

**<u>Order Granting in Part and Denying in Part Defendant L. Lake Jordan's Motion for
Summary Judgment and Denying Plaintiffs' Motion for Summary Judgment</u>**

    This lawsuit stems from a real-estate investment gone awry. A businessman (Defendant Phillip Ruthen) bought a factory he couldn't afford. So he convinced a wealthy investor (Plaintiff Byron Georgiou) to fund the venture. Georgiou and Ruthen drew up terms with the help of Defendant L. Lake Jordan, an attorney who represented Ruthen and his businesses. Georgiou, who argues that Jordan was his attorney too, expected that in exchange for his investment, he would receive a steep interest rate, and eventually own the factory through an LLC: Plaintiff Benjamin Hill Realty ("BHR"). Although Georgiou invested, Ruthen didn't perform. He kept Georgiou's money anyway. Georgiou seeks to hold Jordan responsible for causing his and BHR's losses.

    Jordan and Plaintiffs cross move for summary judgment. (Docs. 188 & 192.) After review, Jordan's Motion (Doc. 188) is granted in part and denied in part. Plaintiffs' Motion (Doc. 192) is denied.

    Georgiou and Jordan's conduct raises a genuine dispute whether they formed an attorney-client relationship. That relationship (if it existed) assigned Jordan duties such as a duty of care, a fiduciary duty, and a duty not to omit material facts from their communications. A reasonable jury could find Jordan breached these duties. Jordan didn't disclose that he had significant conflicts of interests, or that Ruthen and his businesses were in dire financial condition. Indeed, he actively worked against Georgiou's interests by helping Ruthen list the

factory for sale, concealing Ruthen's default on its mortgage, and dissolving BHR. Based on these alleged facts and those discussed below, a genuine dispute remains for trial on the legal malpractice, breach of fiduciary duty, misrepresentation, and elder-abuse claims. Those claims may proceed to trial.

Yet the securities-fraud claims fail. SEC Rule 10b-5, and its state-law analogues, require Jordan to have made an outright misstatement for securities-fraud liability to attach. Preparing an investment document alone isn't enough. Nor—absent an affirmative misstatement—can Jordan be liable for omitting facts from the investment materials. Because Plaintiffs cannot show that Jordan made misstatements, each securities-fraud claim fails. So the Court grants Jordan summary judgment on those claims.

## I. PROCEDURAL BACKGROUND

In September 2024, Jordan filed his Motion for Summary Judgment (Doc. 188). Plaintiffs timely responded. (Docs. 197 & 198.) Jordan timely replied. (Doc. 200.) Plaintiffs also filed their Motion for Partial Summary Judgment (Doc. 192) in September. Jordan timely responded and Plaintiffs timely replied. (Docs. 199 & 201.)

Upon preliminary review, the Court discovered that Plaintiffs relied on excerpted depositions. (Doc. 210 at 1; *see, e.g.*, Doc. 198-17.) So it ordered Jordan and Plaintiffs to file complete versions of the discovery materials—as required by the Local Rules. (Doc. 210 at 1–2.) The moving parties timely responded. (Doc. 212 & 213.)

Upon further review, the Court discovered another issue. Plaintiffs objected to Kim Jackson's expert report, which Jordan relied upon. (Doc. 201 at 5–6.) Because the Court allowed Plaintiffs to cure deficiencies in their Motion and briefing, the Court gave Jordan the opportunity to supplement under Fed. R. Civ. P. 56(e)(1). Jordan did so, submitting a sworn declaration from Ms. Jackson supporting the expert opinions in her report. (Doc. 216-1 at 1.)

With these initial deficiencies addressed, the cross motions for summary judgment are now ripe.

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment Standard

The Court should grant summary judgment if the moving party shows that no genuine dispute remains over "any material fact and that [they are] entitled to a judgment as a matter

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). A genuine dispute of material fact exists if there is sufficient "evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). A factual dispute is "material" if it is a legal element of a claim under the applicable substantive law that might affect the outcome of the case. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). It is "'genuine' if the record taken as a whole could lead a [reasonable jury] to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

The Court must not weigh evidence or judge credibility. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, it credits the nonmovant's evidence as true, and draws all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Even so, a mere "scintilla of evidence" in support of the nonmovant's position cannot create a genuine factual dispute. *Anderson*, 477 U.S. at 248.

These principles apply equally to cross motions for summary judgment. *See Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). That is, the Court must consider each motion in turn, and for each, construe the facts in the nonmovant's favor. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). If after this analysis, no genuine dispute of material fact remains, then the Court should grant summary judgment. *Id.*

**B. Local Rule 56**

The moving parties fail to comply with Local Rule 56. The movant for summary judgment must attach to their motion a separate statement of the material facts that they contend are not genuinely disputed. M.D. Ga. L.R. 56. Each fact should be separately numbered and be supported by specific, record citations. *Id.* In turn, the respondent should attach to its response a separate statement of material facts that it claims are genuinely disputed. *Id.* Local Rule 56 also requires the respondent to address the movant's undisputed facts, and to include a statement of material facts that they claim are genuinely disputed. *Id.*

*1. Jordan's Motion*

For Jordan's Motion, neither he nor Plaintiffs comply with Local Rule 56. Jordan's Statement of Facts doesn't cite the record at all. (*See* Doc. 188 at 1–8.) Granted, the Substantive

Facts section of Jordan's Memorandum in Support corresponds to the numbered Statement of Facts, and that section includes citations. (*Id.*; Doc. 189 at 2–7.) But this doesn't comply for two reasons. First, "the introductory portions of briefs do not constitute a statement of material facts." M.D. Ga. L.R. 56. Second, many propositions in the Substantive Facts are supported only by citations to the Amended Complaint, which cannot form the basis of an asserted fact on a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1).

Plaintiffs likewise fail to comply with Local Rule 56. They adequately respond to Jordan's Statement of Facts. (*See* Doc. 198-1 at 1–11.) Yet they fail to identify any facts that they contend are genuinely disputed. (*See id.*) Instead, Plaintiffs include their own undisputed facts. (*Id.*) This too is insufficient. *See* M.D. Ga. L.R. 56.

*2. Plaintiffs' Motion*

For Plaintiffs' Motion, they follow Local Rule 56, but Jordan doesn't. Plaintiffs attach a statement of separately numbered facts supported by record citations. (Doc. 192-1 at 1–22.) Jordan fails to respond to these facts, and doesn't attach his own statement of disputed facts. (*See* Doc. 199.) So he fails to comply with Local Rule 56 again.

## III. THE FACTUAL RECORD

Benjamin Hill Realty began life in 2017 as a Georgia LLC named Suncrest Fitzgerald. (Doc. 198-10 at 8–10.)[1] Ruthen was its organizer, sole member and manager. (*Id.* at 9–10.) Shortly after organizing the company, Ruthen entered it into a $2.5 million agreement with Defendant Shaw Industries to purchase a property in Fitzgerald, Georgia ("the Shaw Factory"). (Doc. 198-28 at 2–15.) Ruthen hoped to lease the property to Defendant Suncrest Stone Products—also controlled by him—so it could use the property to manufacture stone veneer. (Doc. 212-4 at 36.)

To facilitate the purchase, Suncrest Fitzgerald retained a Valdosta attorney—Jordan—and his firm Coleman Talley. (Doc. 188-1 at 1–2; Doc. 212-2 at 11.) Jordan's first task was changing Suncrest Fitzgerald's name to Benjamin Hill Realty.

---

[1] The Court recounts these facts only to provide background. They don't necessarily reflect the facts taken in the light most favorable to either moving party. Nor are they factual findings as may be determined at a later stage.

(Doc. 198-15 at 3–5; Doc. 198-31 at 1–3; Doc. 212-2 at 30.) But Jordan didn't act solely as Suncrest Fitzgerald's attorney. (Doc. 198-15 at 2–7.) In the coming years, Jordan also performed legal work for Ruthen personally, Suncrest Stone, and Performance Realty (another Ruthen-affiliated LLC). (Doc. 198-15 at 2–71; Doc. 198-16 at 2–5; Doc. 212-2 at 24, 56, 68; Doc. 212-3 at 157–58.)

But there was a problem: Ruthen and the newly-renamed BHR didn't have the money to pay for the Shaw Factory. (Doc. 212-2 at 31.) Jordan's initial solution was to negotiate seller financing—a $2 million mortgage with Shaw. (Doc. 198-28 at 2; Doc. 198-40 at 2.) But this still left $500,000 due at closing, and Ruthen and BHR didn't have that money either. (Doc. 198-28 at 2; *see* Doc. 212-2 at 31.)

So with the closing date looming, Ruthen sought a last-minute investor: Georgiou—a Nevada-based, real-estate investor. (Doc. 212-3 at 117–18; Doc. 198-4 ¶¶ 3, 5.)[2] Ruthen first called Georgiou in late-January 2018. (Doc. 198-4 ¶ 5.) Georgiou initially refused. (*Id.*) But over the next few days, Ruthen persisted. (*Id.* ¶¶ 5–10.) Eventually, Georgiou agreed to tour the Shaw Factory in early February. (*Id.* ¶¶ 10–13.) He agreed to invest a few days later. (*Id.* ¶ 15.)

Once he did, he and Ruthen negotiated terms. (Doc. 212-4 at 48.) Ruthen memorialized his understanding of these negotiations in an initial document. (*Id.*; Doc. 188-5 at 2.) Georgiou responded with handwritten comments. (Doc. 188-5 at 2; Doc. 212-4 at 48.) With the deal nearly final, Ruthen introduced Georgiou to Jordan by email. (Doc. 198-6 at 2.)

Jordan then helped finalize the investment. Georgiou insisted that a Nevada entity own the Shaw Factory. (Doc. 212-4 at 38.) So Jordan suggested a solution: to convert BHR into a Nevada LLC. (*Id.*) Jordan did so at Georgiou's direction. (Doc. 212-2 at 34; Doc. 198-7 at 2–10.) The new articles of incorporation named Ruthen BHR's sole managing member and Georgiou its registered agent. (Doc. 198-7 at 4, 5.) Jordan also asked Georgiou

---

[2] Georgiou is a plaintiff in three capacities: (1) as an individual, (2) as a trustee of Georgiou Family Trust, and (3) as the alleged managing member of BHR. (Doc. 198-4 ¶ 4.)

to procure an Employer Identification Number ("EIN") for BHR, which Georgiou did. (Doc. 198-8 at 2–3, 6–7; Doc. 212-2 at 37–38.)

With the deal nearly complete by February 16, Jordan emailed Georgiou a Term Sheet and an Amended Operating Agreement for BHR. (Doc. 188-4 at 1.) Jordan prepared these documents, which memorialized the previously-negotiated terms. (Doc. 188-4 at 1; Doc. 188-5 at 2; Doc. 212-3 at 112; Doc. 212-4 at 41, 48–49, 50.) Georgiou would provide $1.8 million in capital to BHR, $700,000 at closing and the remainder in 11, weekly installments of $100,000. (Doc. 198-9 at 7–8, 22.) In return, Ruthen would give Georgiou at least a 12% yield on his investment and make Georgiou managing member of BHR. (Doc. 198-9 at 8, 11, 21, 22.) Ruthen also agreed that Suncrest Stone would lease the Shaw Factory and invest $1.2 million in the facility to start operations. (Doc. 198-9 at 7–8.)

The February 16 email also explained the logistics. Jordan asked Georgiou to wire his initial downpayment to Coleman Talley's (Jordan's firm) trust account. (Doc. 188-4 at 1.) That way, once Georgiou and Ruthen approved, Jordan would close on the Shaw Factory. (*Id.*) Jordan also explained that the Amended Operating Agreement would be executed "immediately after closing." (*Id.*) A few days later, Jordan resent the Amended Operating Agreement and solicited further comments. (Doc. 188-7 at 1.)

Georgiou never executed and returned the Amended Operating Agreement. (*See* Doc. 188-10 at 1; Doc. 212-2 at 46, 48, 70; Doc. 212-4 at 58.) Still, he wired $700,000, and gave Jordan permission to close. (Doc. 188-8 at 1; Doc. 212-4 at 47, 60.) Jordan paid $500,000 to Shaw and deducted his legal fees from the remainder. (Doc. 212-2 at 15, 48–50; Doc. 212-4 at 47.) After closing on February 22, he and Georgiou never corresponded again. (*See* Doc. 198-11 at 2; Doc. 212-2 at 42, 48–50, 79–80.)

Things quickly fell apart. Georgiou made the weekly payments at first. (Doc. 212-4 at 60, 64–65.) He sent the initial payment to Suncrest Stone on February 28. (*Id.* at 64–65.) Yet

Suncrest Stone missed its first rent payment to BHR a few days later. (*Id.* at 44–45.)[3] Georgiou continued weekly payments throughout March. (*Id.* at 64–65.)

But by late March, Georgiou had grown "uneasy." (Doc. 212-4 at 60.) Suncrest Stone still hadn't paid any rent. (*Id.*) So Georgiou asked Ruthen to slow payments. (*Id.*; Doc. 198-21 at 4.) Although Georgiou blamed cash-flow issues, this was an excuse. (Doc. 212-4 at 62–63.) In fact, Georgiou hoped to stall until "he could figure out what was going on[.]" (*Id.* at 63.) After this, Georgiou stopped making weekly payments altogether. (*Id.*)

Unbeknownst to Georgiou, Suncrest Stone was insolvent. It never occupied the Shaw Factory. (Doc. 212-3 at 134–136.) Instead, Jordan helped Ruthen list the building for sale almost immediately. (*Id.* at 137.) A few months later, Suncrest Stone sought Jordan's advice on its bankruptcy proceedings. (Doc. 212-3 at 139–41; Doc. 198-41 at 1–24.) Jordan didn't tell Georgiou any of this. (*See* Doc. 212-2 at 42; Doc. 212-3 at 137–41.)

The mortgage on the factory soon fell behind. Nobody paid the first payment when it was due in early June 2018. (Doc. 198-12 at 2–3.) Three days later, a Shaw attorney emailed Jordan to inquire about the payment. (*Id.* at 2.) Jordan forwarded the email to Ruthen, but not Georgiou. (*See id.*; Doc. 212-2 at 53.) Still, Georgiou discovered the missed payment and paid it. (*See* Doc. 212-4 at 64–65.) In July, Georgiou paid Performance Realty Advisors (one of Ruthen's LLCs) expecting that Ruthen would make the mortgage payment. (*Id.* at 65–66.) But Ruthen didn't. (*Id.*)

In mid-August, Ruthen directed Jordan to dissolve BHR. (Doc. 212-3 at 124–25.) So Jordan filed articles of dissolution in Nevada. (*Id.*; Doc. 198-20 at 2–8.) He even paid extra for the 24-hour expedited filing. (Doc. 198-20 at 8.) Jordan doesn't recall whether he analyzed the dissolution's impact on Georgiou or BHR's interest in the Shaw Factory. (Doc. 212-3 at 127.) But either way, Jordan never told Georgiou. (*See* Doc. 212-2 at 42; Doc. 212-3 at 124–25.)

As the mortgage payments fell further behind, Shaw sent formal notices of default. Shaw sent the first on August 17. (Doc. 198-19 at 2.) In response, Jordan directed Shaw to

---

[3] There was an unwritten understanding that Georgiou would make the $100,000 payments to Suncrest Stone. (Doc. 212-4 at 44–45.) It would then, in turn, pay a $26,000, monthly rent payment to BHR. (*Id.*) This figure reflected the interest owed to Georgiou. (*Id.*)

send all further notices to two Coleman Talley addresses, rather than to BHR's addresses. (*Id.*; Doc. 212-3 at 144.) This eliminated any chance that Georgiou, the registered agent, would receive the notices. (*See* Doc. 212-3 at 147; Doc. 212-4 at 68.) Shaw sent the next default notice in late September. (Doc. 188-12 at 1–2.) In January 2019, Shaw called the entire mortgage due. (Doc. 188-13 at 2.)

So to prevent foreclosure, Jordan negotiated a new agreement with Shaw. This was only possible because Jordan had assured Shaw that Ruthen was the sole member and manager of BHR with the authority to sign on its behalf. (Doc. 198-13 at 2.) With this assurance, Shaw and Ruthen executed an agreement for forbearance and a deed-in-lieu-of foreclosure in March 2019. (Doc. 188-14 at 1–20; Doc. 212-2 at 42, 68–69.) Shaw then recorded the deed, and title to the factory reverted from BHR to Shaw. (Doc. 212-2 at 68, 105.) Jordan didn't notify Georgiou about the deed in lieu. (Doc. 212-4 at 68, 103.)

All told, Georgiou invested $1.2 million and lost all of it. (Doc. 212-4 at 42–43, 79–80.) He expected to become part-owner and managing member of BHR and for BHR to own the Shaw Factory. (Doc. 198-9 at 22.) At the same time, Suncrest Stone would begin operations and Ruthen would return Georgiou's investment with steep interest. (*Id.*) Yet as soon as Georgiou invested, Ruthen and Jordan worked to frustrate these expectations. Jordan helped Ruthen list the Shaw Factory for sale, he dissolved BHR without Georgiou's knowledge, and arranged for the factory to revert to its seller. (Doc. 188-14 at 1–20; Doc. 198-20 at 2–8; Doc. 212-2 at 44; Doc. 212-3 at 135, 137.)

## IV. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

Turning to the merits, the Court addresses the cross motions for summary judgment together. After resolving some preliminary issues, it addresses Plaintiffs' claims against Jordan in turn. The Court concludes that genuine disputes remain on the legal malpractice, breach of fiduciary duty, misrepresentation, and elder-abuse claims. But no genuine dispute remains on the securities-fraud claims. Hence summary judgment is granted on those claims.

## A. Preliminary Issues

### 1. *Choice of Law*

Because Plaintiffs assert state-law claims, the Court must choose the applicable law. Plaintiffs bring seven claims against Jordan.[4] Counts 1, 2, and 12 assert securities-fraud claims under federal, Nevada, and Georgia statutes. (Doc. 142 ¶¶ 85–107, 179–88.) Counts 10 and 11 bring an elder-abuse claim under a Nevada statute and a negligence-*per-se* claim based on a Georgia-elder-abuse statute. (*Id.* ¶¶ 166–78.) And Counts 3, 4, and 8 assert state-law-tort claims for breach of fiduciary duty, misrepresentation, and legal malpractice. (*Id.* ¶¶ 108–34, 148–60.)

Where the moving parties agree on the applicable law, the Court doesn't disturb their choice. Parties may "stipulate to (or waive)" the governing law in a diversity case. *Goodnight v. Bos. Sci. Corp.*, 548 F. Supp. 3d 1325, 1332 (S.D. Fla. 2020) (citing *Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998)). Where the moving parties agree on the applicable law, they have effectively stipulated to apply it. Hence for the claims brought under a specific statute (Counts 2, 10, 11 & 12) the Court applies the law of the jurisdiction where the statute is in force (i.e., Nevada or Georgia). And for the state-law misrepresentation claim (Count 4), the Court applies Nevada law. (*See* Doc. 189 at 9; Doc. 198 at 21–24.)

But the moving parties disagree whether Georgia or Nevada law applies to the legal malpractice and breach-of-fiduciary-duty claims (Counts 3 & 8). (*See* Doc. 189 at 9; Doc. 198 at 15–21.) So the Court—applying the applicable principles and rules—chooses for them.

Federal courts apply the forum state's choice-of-law rules when adjudicating state-law claims. *See Boardman Petroleum, Inc. v. Federated Mut. Ins.*, 135 F.3d 750, 752 (11th Cir. 1998). Here, that's Georgia. Generally, Georgia courts apply "the substantive law of the state where the tort was committed." *Dowis v. Mud Slingers, Inc.*, 621 S.E.2d 413, 414 (Ga. 2005). A tort is committed where "the injury . . . was suffered[.]" *Hawkins v. Blair*, 780 S.E.2d 515, 520 (Ga. Ct. App. 2015). Because the alleged injuries for the legal malpractice and breach-of-fiduciary-duty claims occurred in Nevada, Jordan reasons that Nevada law applies.

---

[4] Plaintiffs also assert a claim for "Accounting." (Doc. 242 ¶¶ 161–65.) Neither party moves for summary judgment on this claim, so the Court doesn't address it.

Yet he elides the Georgia choice-of-law distinction between statutory and common-law claims. For statutory claims, "a Georgia court [defers] to another state's statutes" and that state's judicial decisions interpreting those statutes. *Coon v. Med. Cntr., Inc.*, 797 S.E.2d 828, 833–34 (Ga. 2017). Where no statute controls, Georgia common law applies. *Id.* [5] So the choice of law for the negligence and breach-of-fiduciary-duty claims depends on whether they are statutory or common-law causes of action.

In Nevada, both claims derive from the common law. A legal malpractice claim adopts the elements from Prosser's Law of Torts. *Sorenson v. Pavlikowski*, 581 P.2d 851, 853 (Nev. 1978) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 143 (4th ed. 1971)). And a breach-of-fiduciary-duty claim (at least for attorneys) follows the Second Restatement of Torts. *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009) (quoting Restatement (Second) of Torts § 874 cmt. a (1979)). Hence, in Nevada, legal malpractice and breach of fiduciary duty are common-law claims and no statute controls. The Court thus applies Georgia common law.

The moving parties also dispute whether the Amended Operating Agreement is enforceable. (*See, e.g.*, Doc. 189 at 14; Doc. 198 at 17.) Both are silent on which law applies. (*Id.*) Where parties don't address the choice of law for a particular claim, the Court "presume[s] that the substantive law of the forum . . . controls." *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989). Besides, Nevada applies "[b]asic contract principles" to contract formation. *May v. Anderson*, 119 P.3d 1254, 1258 (Nev. 2005) (citing *Keddie v. Beneficial Ins.*, 580 P.2d 955, 956 (Nev. 1978) (Batjer, C.J., concurring) (collecting common-law cases)). In other words, no statute controls and Nevada courts rely on common law. Thus, even without the forum-state presumption, the Court would properly apply Georgia common law to the formation (or not) of the Amended Operating Agreement. *See Coon*, 797 S.E.2d at 833–37.

---

[5] At least for states that apply the common law, which Nevada does. *See Sorenson v. Pavlikowski*, 581 P.2d 851, 853 (Nev. 1978); *Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009).

*2. The Allegations*

Jordan challenges Plaintiffs' allegations in his briefing. (*See, e.g.*, Doc. 189 at 11–12.) That is, he raises a failure-to-state-a-claim defense. But this challenge comes too late. Jordan moves under Rule 56, so the Court assesses Plaintiffs' claims on their merits, in light of the record.

Of course, Jordan could have raised this challenge earlier. Jordan moved to dismiss the case twice in the District of Nevada. (Docs. 24 & 91.) But after the case was transferred, he filed an Answer (Doc. 119) and proceeded to discovery without objection. (*See* Docs. 116 & 128.)

Jordan now challenges Plaintiffs' allegations. Yet Rule 56 requires him to point to specific record evidence, or its absence, to show that no genuine dispute remains. *See* Fed. R. Civ. P. 56(a). So where Jordan challenges the allegations alone, that argument adds little.[6] Jordan's failure to pursue a formal motion to dismiss in this Court leaves it with no choice but to address Plaintiffs' claims on their merits after considering the full record.

To be sure, the Private Securities Litigation Reform Act prescribes more stringent pleading requirements for federal securities claims. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237–38 (11th Cir. 2008) (citing 15 U.S.C. § 78u(b)(1)(B)). Even though Jordan invokes this heightened standard, it doesn't alter the substantive requirements of a federal securities-fraud claim. *See id.* Those substantive requirements remain the same, and the Court evaluates them under the standard for Rule 56 motions.

*3. Georgiou's Membership in BHR*

Jordan argues that because Georgiou wasn't a member of BHR, he "has no standing to bring claims" on the LLC's behalf. (Doc. 189 at 14.) The moving parties analyze the issue only in relation to the duty element of the legal malpractice and breach of fiduciary duty claims. (*See* Doc. 189 at 14–15; Doc. 198 at 16–19.) This may be because Jordan argues that he owed

---

[6] Still, Plaintiffs are bound by the legal theories in the Amended Complaint. *See MSP Recovery Claims, Series LLC v. United Auto. Ins.*, 60 F.4th 1314, 1319 (11th Cir. 2023). Thus, Jordan properly objects to Plaintiffs' attempt to amend their negligence-*per-se* theory in response to his motion. The Court addresses that issue in a later section.

Georgiou no "duty" because he wasn't BHR's manager. But this is more properly viewed as a determination whether Jordan breached his duty to BHR, by failing to communicate with Georgiou and acting against his interests. That Jordan owed BHR a duty is undisputed. (Doc. 189 at 14; Doc. 198 at 20.) So the Court construes Jordan as arguing for summary judgment on the claims asserted by BHR, on the basis that Georgiou lacks the authority to assert a claim on its behalf.[7] Still, the Court addresses Jordan's arguments on Georgiou's relationship to BHR that speak to the breach issues in later sections.

Plaintiffs respond that "it is . . . undisputed that Georgiou became a 50% member of BHR when he met his capital contribution[.]" (Doc. 192 at 18; Doc. 198 at 17.) They assert this in opposition to Jordan's Motion, and also as grounds for summary judgment in their favor. (*Id.*) So the Court construes Plaintiffs as asserting that no genuine dispute remains that Georgiou was BHR's managing member.

But these arguments hinge on a single question: Did Georgiou's capital contribution render the Amended Operating Agreement an enforceable contract that made him the managing member of BHR? If so, then Georgiou can sue on BHR's behalf. If not, then BHR's previous operating agreement controls, Ruthen is its sole member and manager, and Georgiou cannot sue on BHR's behalf. (*See* Doc. 198-42 at 2–20.)

The undisputed evidence shows that Georgiou accepted the Amended Operating Agreement by performance. Under that agreement, Georgiou is BHR's manager. (*See* Doc. 198-9 at 11.) An enforceable contract requires mutual assent to its essential terms. *Se. Grading, Inc. v. City of Atlanta*, 324 S.E.2d 776, 779 (Ga. Ct. App. 1984). That is, an offer and acceptance. *Id.* Delivery of a signed, written contract is the classic form of acceptance. *E.g.*, *Howel v. Kinney*, 105 S.E. 716, 717 (Ga. Ct. App. 1921). But a party may also accept through partial performance under an agreement. *Legg v. Stovall Tire & Marine, Inc.*, 538 S.E.2d 489, 491 (Ga. Ct. App. 2000). The "circumstances surrounding the making of the contract, such as correspondence and discussions, are [also] relevant" to resolving whether the parties mutually

---

[7] Considering Jordan's arguments and their context, the Court concludes that he cannot reasonably be construed as challenging either Article III or contractual standing. (*See* Doc. 189 at 14–15.)

assented. *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 297 S.E.2d 733, 737 (Ga. 1982). These extrinsic facts may create a jury question, but only when disputed. *See Bedsole v. Action Outdoor Advert. JV, LLC*, 750 S.E.2d 445, 450 (Ga. Ct. App. 2013).

The Amended Operating Agreement reflected the essential terms of Ruthen's offer. After their negotiations, Ruthen and Georgiou arrived at terms. (*See* Doc. 198-10 at 2.) The Term Sheet (Doc. 198-9 at 22) memorialized the fruits of the negotiations. (Doc. 198-10 at 2.) Jordan prepared the Amended Operating Agreement to reflect the provisions of the Term Sheet. (Doc. 198-9 at 2–21.) As the agreement explained, in exchange for an initial capital contribution of $700,000 and subsequent weekly payments, Georgiou would receive 50% membership in BHR. (Doc. 198-9 at 7–8, 21.) That share would make Georgiou the "sole Manager[,]" with the authority to manage "all of the business and affairs of [BHR]." (*Id.* at 11.)

Jordan communicated these terms to Georgiou by email. Jordan first did so on February 16. (Doc. 198-10 at 2.) His email explained that, after closing, the Amended Operating Agreement "w[ould] be excuted[.]" (*Id.*) But the email also asked Georgiou to wire the initial $700,000 contribution—his end of the bargain—to the Coleman Talley trust and to procure an EIN. (Doc. 198-10 at 2.) Jordan emailed the Amended Operating Agreement again on February 20. (*See id.*; Doc. 188-7 at 1.)

Georgiou initially did everything Jordan asked. In response to the February 16 email, Georgiou forwarded the EIN. (Doc. 198-8 at 2.) On February 21, Georgiou wired $700,000 to the trust account and gave Jordan permission to close on the factory. (Doc. 188-8 at 1; Doc. 212-4 at 60.) In the coming weeks, Georgiou sent five, weekly payments. (Doc. 198-9 at 7–8; Doc. 212-4 at 64–65.) Overall, Georgiou sent $1.2 million, which Ruthen accepted without apparent complaint. (*See* Doc. 198-21 at 2; Doc. 212-4 at 89–90.)

So, Ruthen and Jordan emailed an offer to Georgiou. The Amended Operating Agreement explained that offer's terms. That is, Georgiou's expected performance (pay the downpayment and make weekly payments) and what he would get in return (become BHR's managing member). In response, Georgiou made the downpayment and began the weekly payments. These facts are undisputed. And, taken together, meet the requirements of mutual

assent. In other words, Georgiou accepted the Amended Operating Agreement when he performed under its terms.

To be sure, Georgiou ignored Jordan's requests to sign and return the Amended Operating Agreement. (*See* Doc. 198-9 at 2; Doc. 198-10 at 2; Doc. 212-3 at 134.) Yet this fact alone doesn't create a genuine dispute. An offer may specifically limit its acceptance to an executed writing. *Doss & Assocs. v. First Am. Title Ins. Co.*, 754 S.E.2d 85, 90 (Ga. Ct. App. 2013). But an offeror must manifest the intent that the agreement will not become binding until signed by all parties. *See Comput. Maint. Corp. v. Tilley*, 322 S.E.2d 533, 536–37 (Ga. Ct. App. 1984). Even taking the facts in the light most favorable to Jordan, these requests alone do no more than suggest a manner of acceptance. They are insufficient to manifest an intent to limit the method of acceptance to an executed writing. Georgiou was thus free to accept the agreement in other ways—such as by his performance.

Thus, the Court concludes, as a matter of law, that the Amended Operating Agreement is enforceable. No genuine dispute remains that Georgiou is BHR's manager. As a result, he may sue on BHR's behalf. (*See* Doc. 198-9 at 11.)

### B. Legal Malpractice Claims

With these initial matters resolved, the Court proceeds to the moving parties' arguments on the claims. Jordan and Plaintiffs both move for summary judgment on the negligence claims against Jordan. (Doc. 189 at 13–15; Doc. 192 at 17–21.) Against him, these claims sound in legal malpractice. (*See* Doc. 142 ¶¶ 148–160)*; see Ballard v. Frey*, 346 S.E.2d 893, 896 (Ga. Ct. App. 1986).[8] Plaintiffs allege that Jordan was negligent in his attorney-client relationship with Georgiou in his individual capacity. (Doc. 198 at 15–19.) And they allege that Jordan was negligent in his attorney-client relationship with BHR. (*Id.*) Because a genuine dispute remains whether an attorney-client relationship formed with Georgiou, and whether Jordan acted negligently, neither party is entitled to summary judgment on the legal malpractice claims.

---

[8] Plaintiffs also allege ordinary negligence against other Defendants. (*See* Doc. 142 ¶¶ 148–153, 155–160.) But these claims don't impact the analysis here.

*1. Attorney-Client Relationships*

To succeed on each malpractice claim, Plaintiffs must show (1) an attorney-client relationship, (2) that Jordan failed "to exercise ordinary care, skill, and diligence[,] and (3) that [his] negligence caused [each] [P]laintiff's damages." *See Armstrong v. Cuffie*, 860 S.E.2d 504, 507 (Ga. 2021). Jordan admits that he represented BHR. (Doc. 189 at 14.) So for the BHR malpractice claim, no genuine dispute remains on duty. Yet Jordan argues that Plaintiffs cannot show an attorney-client relationship with Georgiou individually, and Plaintiffs argue that one existed as a matter of law. But with evidence on both sides, neither party can show beyond genuine dispute that Georgiou and Jordan did, or didn't, have an attorney-client relationship.

An attorney-client relationship is typically an express, contractual arrangement. *Samnick v. Goodman*, 841 S.E.2d 468, 473 (Ga. Ct. App. 2020). Yet the plaintiff and the attorney's conduct may also imply one. *Guillebeau v. Jenkins*, 355 S.E.2d 453, 457 (Ga. Ct. App. 1987). If the plaintiff reasonably believes that the attorney represents them, then an implied relationship exists. *Browne & Price, P. A. v. Innovative Equity Corp.*, 864 S.E.2d 686, 692 (Ga. Ct. App. 2021). A belief is reasonable if it is "reasonably induced by [the attorney's] representations or conduct." *Id.*

The payment of a fee to an attorney is an important consideration. *Mays v. Askin*, 585 S.E.2d 735, 737 (Ga. Ct. App. 2003). But it isn't always dispositive. *Calhoun v. Tapley*, 395 S.E.2d 848, 849 (Ga. Ct. App. 1990). Courts also examine the nature of the relationship between the plaintiff and the attorney. *Guillebeau*, 355 S.E.2d at 457. Or whether the plaintiff told the attorney that he was relying on the advice. *Horn v. Smith & Meroney, P.C.*, 390 S.E.2d 272, 273 (Ga. Ct. App. 1990). Or whether the attorney actually offered legal advice or assistance. *Cleveland Campers, Inc. v. R. Thad McCormack, P.C.*, 635 S.E.2d 274, 276 (Ga. Ct. App. 2006). Or even the plaintiff's sophistication. *See Legacy Homes, Inc. v. Cole*, 421 S.E.2d 127, 128–29 (Ga. Ct. App. 1992).

Whether Georgiou retained Jordan remains in genuine dispute. On the one hand, sufficient evidence supports an attorney-client relationship. Georgiou testified that he believed that Jordan was his attorney. (Doc. 212-4 at 53, 71.) Some facts suggest this belief was reasonable. At Georgiou's direction, Jordan converted BHR into a Nevada entity. (Doc. 198-6 at 2; Doc. 212-4 at 72, 90.) Jordan then directed Georgiou to obtain an EIN for the newly-

converted BHR, which Georgiou did. (Doc. 198-8 at 2–3.) Jordan also drafted the Term Sheet and Amended Operating Agreement on Ruthen and Georgiou's behalf. (*Id.*) So Jordan performed legal tasks for Georgiou. Also, Jordan deducted his fees from the downpayment Georgiou wired to the Coleman Talley trust. (Doc. 212-2 at 15.) From these facts, a reasonable jury could find an attorney-client relationship.

On the other hand, certain facts undercut an attorney-client relationship. Georgiou and Jordan interacted for only a short time (less than a week) and never executed a retainer agreement. (*See* Doc. 198-6 at 2–4; Doc. 198-9 at 2; Doc. 198-10 at 2; Doc. 198-8 at 2–3; Doc. 198-11 at 2; Doc. 212-2 at 37, 41; Doc. 212-4 at 73.) They communicated only by email. (*See* Doc. 212-2 at 41.) Although Jordan performed legal tasks at Georgiou's direction, he never gave Georgiou legal advice. (Doc. 212-2 at 13.) Nor did Georgiou tell Jordan that he was relying on any advice. (*See* Doc. 188-7 at 1; Doc. 192-5 at 2–4; Doc. 192-7 at 2–7; Doc. 192-8 at 2; Doc. 192-9 at 2; Doc. 192-10 at 2.)

Georgiou's sophistication also undercuts an attorney-client relationship. He is a seasoned attorney, with decades of experience in real-estate transactions. (Doc. 212-4 at 8–11.) So Georgiou had considerable, personal experience with attorney-client relationships in similar transactions. Viewed in the light most favorable to Jordan, Georgiou's experience should have alerted him that their attorney-client relationship was at least uncertain. Indeed, this experience calls his belief that Jordan was his attorney into doubt—a credibility determination reserved for the jury.

Plaintiffs protest that considering Georgiou's sophistication, would "depart from our commitment to protecting the rights of those who seek counsel and [would] create an impermissible hierarchy of rights based on a client's perceived sophistication." (Doc. 201 at 2.) Plaintiffs cite no authority for this position. (*See id.*) And whatever its policy-based merits, if any, Georgia law considers a putative client's sophistication relevant. *See Legacy Homes*, 421 S.E.2d at 128–29. By illustration, in *Legacy Homes* the buyer in a real-estate transaction sued the seller's closing attorney for malpractice. *Id.* at 127–29. Yet the buyer couldn't show an attorney-client relationship, in part, because she "was an experienced businesswoman who had participated in many closings without legal counsel, and she had no history of any past dealings

with [the attorney] or his firm." *Id.* at 129. Similarly, Georgiou is an experienced businessman and attorney, seeking to show an attorney-client relationship with the attorney representing the opposing party in a real-estate investment, who Georgiou had no prior dealings with. (*See* Doc. 198 at 15–19.) Hence the Court properly considers Georgiou's sophistication, which undercuts an attorney-client relationship. This sophistication, and the other facts undercutting a relationship, create a genuine dispute whether an attorney-client relationship formed.

Thus, for the individual-capacity malpractice claim, Plaintiffs haven't shown they are entitled to summary judgment because a genuine dispute remains whether Georgiou retained Jordan. But Jordan also challenges the breach element of the individual-capacity claim. So to avoid summary judgment on that claim, Plaintiffs must show a genuine dispute on breach.

For the BHR malpractice claim, Jordan admits to an attorney-client relationship with BHR. Hence Plaintiffs may still show they are entitled to summary judgment on the BHR malpractice claim if they establish a breach of Jordan's duty of care. To avoid this, Jordan must show a genuine dispute whether he breached his duty to BHR. But for Plaintiffs to avoid summary judgment against them on the BHR malpractice claim, they must show a genuine dispute on the same issue. In other words, if a genuine dispute remains on Jordan's breach of his attorney-client duties to BHR, neither party is entitled to summary judgment on the BHR malpractice claim.

*2. Breach*

To show breach, Plaintiffs must establish that Jordan failed "to exercise ordinary care, skill and diligence." *See Leibel v. Johnson*, 728 S.E.2d 554, 555 (Ga. 2012).[9] This standard requires an attorney to exercise the "skill and care ordinarily employed [by attorneys] under similar conditions and . . . circumstances." *Lalonde v. Taylor English Duma, LLP*, 825 S.E.2d 237, 240 (Ga. Ct. App. 2019) (quoting *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 453 S.E.2d 719, 720 (Ga. 1995)). The Court presumes that an attorney performs services "in an ordinar[ily] skillful manner" unless the plaintiff rebuts the presumption with expert legal testimony. *Botes*

---

[9] Plaintiffs must also show causation, but Jordan doesn't challenge that element. (*See* Doc. 189 at 13–15.)

*v. Weintraub*, 463 F. App'x 879, 885 (11th Cir. 2012) (quoting *Johnson v. Butcher*, 301 S.E.2d 665, 666–67 (Ga. Ct. App. 1983)). But once the plaintiff provides such expert testimony, breach is a jury question. *Johnson*, 301 S.E.2d at 666–67.

Both moving parties supply the required expert testimony. (*See* Docs. 216-2 & Doc. 198-2.)[10] Plaintiffs' expert opines that Jordan breached his duty of care when he failed (1) to notify Georgiou about the default of the Shaw Factory mortgage, (2) to inform Georgiou when Ruthen executed the deed-in-lieu-of foreclosure, and (3) to advise Georgiou of his potential conflicts of interests or advise Georgiou to seek separate counsel. (Doc. 198-2 ¶¶ 3, 4, 8.) These opinions apply both to Georgiou individually, and to him as BHR's manager. (*See id.* ¶¶ 1, 3–9.) So, in both capacities, Plaintiffs have rebutted the presumption that Jordan acted in an ordinarily skillful manner toward Georgiou, precluding summary judgment on the individual-capacity claim.

Yet Jordan's expert creates a factual dispute over Jordan's duty to Georgiou as BHR's manager—precluding summary judgment on that claim too. His expert opines that Jordan reasonably believed that Ruthen—not Georgiou—was BHR's manager. (Doc. 216-2 ¶ 13.) So when Jordan failed to apprise Georgiou of Ruthen's default, the deed-in-lieu, or his own conflicts of interest, Jordan didn't violate any duty of care to BHR. (*Id.* ¶¶ 14–16.) Of course, Plaintiffs' expert disagrees. (*See* Doc. 198-2.) But this creates no more than another jury question.

Admittedly, Jordan's expert's conclusions conflict with the Court's conclusion that Georgiou was BHR's manager. But the nature of those conclusions renders this tension necessary. On a motion for summary judgment, the Court may determine matters of law, such as the formation of a contract, where the facts are undisputed. *See* Fed. R. Civ. P. 56(a). By

---

[10] Plaintiffs ask the Court not to consider Ms. Jackson's expert report because it isn't certified. (Doc. 201 at 5–6.) Ordinarily, the Court may not consider unsworn statements on a motion for summary judgment. *Roy v. Ivy*, 53 F.4th 1338, 1347 (11th Cir. 2022) (quoting *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)). But the Court allowed Jordan to supplement under Fed. R. Civ. P. 56(e). He responded with a declaration averring to the contents of Ms. Jackson's expert report. (Doc. 216-1.) It complies with the Rules. *See* Fed. R. Civ. P. 56(c)(1), (4). So the Court properly considers Ms. Jackson's declaration and report. Plaintiffs' objection is thus overruled.

contrast, "expert testimony is necessary to establish the parameters of acceptable professional conduct [for an attorney], a significant deviation from which would constitute malpractice." *Leibel*, 728 S.E.2d at 556 (alteration adopted) (quoting *Berman v. Rubin*, 227 S.E.2d 802, 806 (Ga. Ct. App. 1976)). In other words, an expert defines appropriate attorney conduct as a matter of fact, not law. *See Johnson*, 301 S.E.2d at 666–67. So where legal experts disagree whether an attorney's conduct was acceptable, they create a genuine dispute of fact. *See id.* Here, the experts disagree. (*See* Docs. 198-2 & 216-2.) This factual dispute precludes summary judgment, even though Georgiou, as a matter of law, is BHR's manager.

### 3. Conclusion: Legal Malpractice Claims

Thus, the Court denies summary judgment on the legal malpractice claims. Judgment isn't proper in Jordan's favor because a genuine dispute (at best) remains whether he owed duties to Plaintiffs, and if he breached those duties. Conversely, summary judgment isn't proper in Plaintiffs' favor because a genuine dispute remains whether Jordan owed a duty to Georgiou individually, and whether Jordan breached his duty to BHR and Georgiou. The Court thus denies summary judgment on the legal malpractice claims.

## C. Breach of Fiduciary Duty

Jordan next moves for summary judgment on the breach-of-fiduciary-duty claims against him. (Doc. 189 at 13–15.) Similar to the legal malpractice claims, Plaintiffs assert breach-of-fiduciary-duty claims flowing from Jordan's relationship with Georgiou individually, and Jordan's relationship with BHR. (*See* Doc. 198 at 19–21.) Because Plaintiffs can show a genuine dispute whether Jordan owed them fiduciary duties, and whether Jordan breached those duties, Jordan isn't entitled to summary judgment.

An attorney owes a client a fiduciary duty. *Tunsil v. Jackson*, 546 S.E.2d 875, 878 (Ga. Ct. App. 2001). As discussed, Plaintiffs have shown a genuine dispute over Jordan's attorney-client relationship with Georgiou individually. Through that relationship, Jordan owed Georgiou a fiduciary duty. *See Tunsil*, 546 S.E.2d at 878. And Jordan admits that BHR was his client. (Doc. 189 at 14.) So he owed BHR a fiduciary duty too. *See Tunsil*, 546 S.E.2d at 878. Still, Jordan argues that Plaintiffs cannot show that he breached a fiduciary duty to either.

An attorney's actions must always align with their client's best interests. *Paul v. Smith, Gambrell & Russell*, 599 S.E.2d 206, 209 (Ga. Ct. App. 2004). That is, an attorney must "show loyalty, good faith, and apply [their] best skill, zeal, and diligence [in representing] their clients." *Tunsil*, 546 S.E.2d at 878.

Plaintiffs can show a genuine dispute whether Jordan breached his fiduciary duties to them. For starters, an attorney may not continue a representation if a conflict arises with another client. *Traub v. Washington*, 591 S.E.2d 382, 385 (Ga. Ct. App. 2003). A conflict arises "if there is a significant risk that . . . the lawyer's duty to another client will materially and adversely affect the representation[.]" Ga. R. Pro. Conduct 1.7(a). Jordan represented Ruthen while he was soliciting a large investment from Georgiou. (*See* Doc. 212-2 at 18–82.) These interests began adverse, but became more so when Ruthen failed to pay the Shaw Factory mortgage and didn't invest in and occupy the factory. (*See* Doc. 188-12 at 1–2; Doc. 188-13 at 1–4; Doc. 198-19 at 2; Doc. 212-3 at 135, 137.) Yet Jordan never sought to waive Ruthen and Georgiou's conflicting interests. (*See* Doc. 212-2 at 23.)

What is more, Jordan advanced Ruthen's interests at Georgiou's expense. An attorney may not act against one client to gain an advantage for another client. *Traub*, 591 S.E.2d at 385. Just two months after Georgiou invested, Jordan assisted Ruthen in listing the Shaw Factory for sale. (Doc. 212-3 at 135, 137.) A few months later, Jordan dissolved BHR. (Doc. 212-3 at 124–25.) Eventually, he helped Ruthen negotiate a deed-in-lieu-of foreclosure which extinguished Georgiou's interest in the factory. (Doc. 188-14 at 1–20; Doc. 212-4 at 77.) These actions frustrated Georgiou's expectation that BHR, with him as managing member, would own the factory, and that Suncrest Stone would occupy it and invest $1.2 million to begin operations. (Doc. 198-9 at 3–22.)

Jordan also represented BHR while representing three other clients with adverse interests. Chiefly, Jordan represented clients who disputed the ownership and management of BHR. Georgiou believed that he was manager. (Doc. 212-4 at 73.) But Jordan believed that Ruthen was manager, and acted to advance Ruthen's stake to Georgiou's detriment. (Doc. 188-14 at 1–20; Doc. 212-3 at 134; *see id.* at 124–25, 135, 137; Doc. 212-4 at 79.) In turn,

BHR had an interest in resolving its disputed ownership, an interest that might have been adversely affected by Jordan's representation of Georgiou and Ruthen.

But BHR and Suncrest Stone also had a conflict. Jordan was Suncrest Stone's lawyer too. (Doc. 198-15 at 2–7.) Yet he ensured that Suncrest Stone would never lease the Shaw Factory or invest in it. (*See* Doc. 212-3 at 134–36.) Even the potential of the lease transaction represented a conflict, but when Suncrest Stone didn't execute a lease, occupy the factory, or invest, the conflict became more acute. (*See* Doc. 188-12 at 1–2; Doc. 188-13 at 1–4; Doc. 198-19 at 2; Doc. 212-3 at 135–137.) Nevertheless, Jordan didn't seek to waive Suncrest Stone's conflicted interests with his other clients. (*See* Doc. 212-2 at 23.)

Besides, good faith also required Jordan to inform his clients about "all material facts [that] concern the transaction[]." *See Glisson v. Freeman*, 532 S.E.2d 442, 449 (Ga. Ct. App. 2000). The status of Georgiou's investment was critical to the transaction in which Jordan allegedly represented him. (*See* Doc. 212-4 at 79.) Yet Jordan ceased contact with Georgiou as soon as the purchase closed. (*See* Doc. 198-11 at 2; Doc. 212-2 at 42, 50, 79–80.) Jordan even took steps to conceal material information. After the first default notice, Jordan directed Shaw to send further notices to the Coleman Talley addresses—thereby concealing them from Georgiou, BHR's registered agent. (Doc. 198-19 at 2; Doc. 212-3 at 144.) By dissolving BHR, Jordan eliminated the possibility that Georgiou would receive correspondence as the LLC's registered agent. (*See* Doc. 212-3 at 144; Doc. 198-19 at 2.)

So, Plaintiffs have introduced evidence that Jordan represented (at least) four clients in relation to the Shaw Factory purchase, with varying levels of conflicted interests. And, at times, he actively worked against BHR and Georgiou's interests. These facts are enough to raise a genuine dispute of material fact whether Jordan breached his fiduciary duty to Georgiou and BHR. The Court thus denies summary judgment on the breach-of-fiduciary-duty claims.

### D. Misrepresentation Claims

Jordan moves for summary judgment on the intentional and negligent misrepresentation claims against him. (Doc. 189 at 15–17.) The moving parties don't distinguish between the claims, and the Court doesn't either. Even though these claims have meaningful distinctions, those distinctions don't impact their analysis here. *See Nelson v. Heer*,

163 P.3d 420, 426 (Nev. 2007) (intentional misrepresentation elements); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) (negligent misrepresentation elements).

Plaintiffs allege that throughout the negotiations, Jordan made material misrepresentations and omissions which induced Georgiou to invest. (Doc. 198 at 21–24.) Not only do Plaintiffs allege affirmative misrepresentations in the Term Sheet and Amended Operating Agreement, but they also allege that Jordan omitted information about Ruthen and Suncrest Stone's inability to perform. (*Id.* at 22–23.) Jordan claims that Plaintiffs cannot show a misrepresentation, and they cannot show that Georgiou relied on the alleged misrepresentation. (Doc. 189 at 15–17.) To be sure, Plaintiffs must show both to prevail on the misrepresentation claims. *See Nelson*, 163 P.3d at 426; *Barmettler*, 956 P.2d at 1387. But a genuine dispute remains on both elements.

*1. Misrepresentation*

Jordan first claims that because he only memorialized the agreement between Georgiou and Ruthen, he didn't misrepresent anything. (Doc. 189 at 16–17.) Maybe so. But Nevada courts equate the omission under a good-faith duty to disclose with an affirmative misrepresentation. *Midwest Supply, Inc. v. Waters*, 510 P.2d 876, 878 (Nev. 1973). The reason is that such an omission "is effectively an indirect representation that the omitted material fact does not exist." *Nelson*, 163 P.3d at 426. A fiduciary relationship, such as an attorney-client relationship, triggers a duty to disclose material facts. *See Foley v. Morse & Mowbray*, 848 P.2d 519, 521–24 (Nev. 1993). So Plaintiffs need not show that Jordan affirmatively misrepresented anything, only that he omitted a fact that his fiduciary relationship with Georgiou bound him to disclose. *See Nelson*, 163 P.3d at 426.

Plaintiffs have introduced evidence—viewed in the light most favorable to them—that Jordan omitted facts he had a duty to disclose. Specifically, Jordan's attorney-client relationship with Georgiou created a fiduciary duty to him. Yet Jordan failed to disclose that Suncrest Stone and Ruthen might be unable to perform as promised, even though he had insider knowledge of their poor financial condition.

Jordan learned this insider information from his ongoing representations of Ruthen and Suncrest Stone. Jordan had represented them since mid-2017. (Doc. 188-1 at 1–2.) He billed Suncrest Stone for tax advice. (Doc. 198-15 at 4.) In Ruthen's bills, Jordan memorialized

inquiries into Ruthen's ability to pay for the Shaw Factory. (Doc. 198-16 at 3.) Indeed, Jordan knew that Ruthen couldn't afford the Shaw Factory. (Doc. 212-2 at 31.) Hence Jordan knew that Ruthen might be insolvent, and had insider knowledge of Suncrest Stone's finances.

The events after Georgiou's investment confirm Ruthen's insolvency and suggest that Suncrest Stone was insolvent too. The company filed for bankruptcy soon after Georgiou invested. (Doc. 212-3 at 140–41; Doc. 198-41 at 1–24.) Around the same time, Ruthen's creditor emailed Jordan to collect an unrelated debt. (Doc. 212-3 at 109.) Admittedly, these events were after Georgiou invested. (*See* Doc. 212-3 at 109, 140–41; Doc. 212-4 at 64–65; Doc. 198-41 at 1–24.) But their temporal proximity to Georgiou's investment, coupled with Jordan's insider knowledge, permit the reasonable inference that Jordan knew about these financial problems when Georgiou invested.[11]

Yet Jordan induced Georgiou to invest based on terms that required Ruthen and Suncrest Stone to pay more than $1.2 million almost immediately. (Doc. 198-9 at 7–8.) Only two weeks after Georgiou invested, Suncrest Stone should have executed a lease with BHR. (Doc. 198-29 at 2.) That lease would give Georgiou at least a 12% monthly return. (*Id.*) Then, Suncrest Stone would invest $1.2 million. (*Id.*) Naturally, Ruthen's insolvency and Suncrest Stone's impending bankruptcy rendered all of these promises impossible.

A reasonable jury could infer that Jordan knew this, or at least, that he knew that Ruthen and Suncrest Stone's financial condition rendered them unlikely to perform as expected. Yet he withheld this information, and his omission altered Georgiou's decision to invest. Thus, a genuine dispute remains whether Jordan omitted a material fact that his fiduciary relationship bound him to disclose. *See Nelson*, 163 P.3d at 426.

*2. Actual Reliance*

Jordan argues that "the fraud claim . . . fails because Plaintiffs cannot show that Georgiou relied on anything Jordan said." (Doc. 200 at 4.) Of course, the misrepresentation claims require Plaintiffs to show that Georgiou, in fact, relied on Jordan's omission. *See*

---

[11] Jordan denies that he knew about the bankruptcy proceeding when Georgiou invested. (*See* Doc. 212-3 at 139.) But this raises a credibility question for the jury.

*Barmettler*, 956 P.2d at 1387.[12] But the evidence is sufficient to show that Georgiou did so for two reasons.

First, Georgiou invested after Jordan's alleged misrepresentations. Ruthen and Georgiou initially agreed to the investment. (*See* Doc. 198-4 ¶ 15.) But Jordan prompted each of Georgiou's subsequent actions. Jordan directed Georgiou to obtain an EIN. (Doc. 198-8 at 2–7; Doc. 212-2 at 36–37.) Jordan emailed Georgiou the Amended Operating Agreement and Term Sheet—which contained the alleged omissions. (Doc. 198-10 at 2.) In the same email, Jordan instructed Georgiou to wire the downpayment. (*Id.*) Jordan sent the investment terms again a few days later. (Doc. 188-7 at 1.) Georgiou wired the downpayment soon after. (Doc. 188-8 at 1.) So Georgiou wired his investment only after Jordan sent him the alleged misstatements. From this sequence, a reasonable jury could infer that Georgiou relied on the alleged misrepresentations.

Second, the direct evidence confirms this inference. Georgiou avers that the Term Sheet, Amended Operating Agreement, and Jordan's email representations induced him to invest. (Doc. 198-4 ¶¶ 13, 15, 21, 23, 27, 45.) Even Jordan admits that Georgiou relied on the Term Sheet. (Doc. 212-2 at 49.) So the party admissions alone establish a genuine dispute over Georgiou's reliance too.

### 3. Conclusion: Misrepresentation Claims

Consequently, Jordan's challenges to the intentional and negligent misrepresentation claims fail. A genuine dispute remains whether Jordan misrepresented Suncrest Stone and Ruthen's financial condition, and whether Georgiou relied on those misrepresentations. The Court thus denies summary judgment on the misrepresentation claims.

### E. Securities-Fraud Claims

Jordan and Plaintiffs both move for summary judgment on the securities-fraud claims. (Doc. 189 at 9–13; Doc. 192 at 21–27.) Plaintiffs bring three securities claims against Jordan:

---

[12] Admittedly, the Court has some difficulty disentangling Jordan's arguments on this issue. Nevada law also requires Plaintiffs to show that Georgiou's reliance was justifiable. *See Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987). But Jordan doesn't invoke this doctrine, nor does he discuss the reasonableness of Georgiou's reliance. So the Court concludes that Jordan doesn't argue that Plaintiffs cannot show justifiable reliance.

(1) a federal securities-fraud claim under Section 10(b) of the Securities and Exchange Act and SEC Rule 10b-5; (2) a Nevada securities-fraud claim under N.R.S. §§ 90.295 and 90.660; and (3) a Georgia securities-fraud claim under O.C.G.A. § 10-5-58(b). Jordan moves for summary judgment on all three claims. (Doc. 189 at 9–13.) But Plaintiffs move only on the federal and Georgia claims. (Doc. 192 at 21–28.)

Jordan concedes that the Term Sheet was a securities offering. (*See* Doc. 189 at 9–13.) But he argues, among other things, that the securities-fraud claims fail because Jordan only prepared the offering, he didn't make the alleged misstatements in it. (*Id.*) The Court agrees. Although the securities claims are not identical, each fails because Plaintiffs cannot show that Jordan was the "maker" of the alleged misstatements within the meaning of federal securities law (which dictates the standard for the state-law claims too). Hence no genuine dispute remains on the securities-fraud claims, and Jordan is entitled to judgment as a matter of law.

### 1. *Federal Securities-Fraud Claim*

Federal securities law provides the blueprint for the "maker" inquiry for each securities-fraud claim. The Securities and Exchange Act of 1934 prohibits the use of any "deceptive device" "in connection with the purchase or sale of any security" which violates SEC rules. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 15 U.S.C. § 78j(b)). Plaintiffs allege an SEC Rule 10b-5 claim which (among other things) prohibits "the making of any untrue statement of a material fact or the omission of any material fact necessary . . . to make [that] statement . . . not misleading." *Id.* (quotation marks and original alterations omitted) (quoting 17 C.F.R. § 240.10b-5). To prevail, Plaintiffs must prove (1) that Jordan made a material misrepresentation or omission, (2) scienter, (3) a connection between that misrepresentation or omission and the purchase or sale of a security, (4) that Georgiou relied on the misrepresentation or omission, (5) an economic loss, and (6) causation of that loss. *See Stoneridge Inv. Partners v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Jordan challenges the first element. (*See* Doc. 189 at 13.) The Rule 10b-5 claim tracks the allegations of the misrepresentation claims. That is, Plaintiffs allege that Jordan affirmatively misrepresented material facts in the Term Sheet. (Doc. 198 at 30.) And that Jordan omitted material information from it, such as his conflicts of interest, and Ruthen and Suncrest Stone's insolvency. (*Id.* at 30–31.)

### a. Affirmative Misstatements

Jordan first argues that he didn't make the statements, he merely adopted Ruthen's statements and transmitted them to Georgiou. (Doc. 189 at 12–13.) Private plaintiffs may not pursue aiding-and-abetting claims under Rule 10b-5. *Stoneridge Inv. Partners*, 552 U.S. at 157. Of course, attorneys (and other secondary actors) may be primary Rule 10b-5 violators. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). But the attorney must meet each requirement for primary liability. *Id.* In other words, a lawyer's substantial role in a fraudulent transaction doesn't trigger liability. *Id.*

Hence Plaintiffs must show that Jordan made the alleged misstatements in his own right. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143–47 (2011). A statement's maker is the one with the "ultimate authority over [it], including its content and whether and how to communicate it." *Id.* at 142. Without this authority, a person merely makes suggestions; they don't make the statement in their own right. *Id.* at 143–47 So a person who prepares a statement on another's behalf isn't its maker. *Id.* at 142; *see In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1272–73 (11th Cir. 2016) (holding that the plaintiff hadn't sufficiently alleged a Rule 10b-5 claim against stock promoters who only assisted in preparing investment materials).

Plaintiffs cannot show that Jordan exercised the requisite authority. After Georgiou agreed to invest, he and Ruthen negotiated. (Doc. 212-4 at 48.) Ruthen emailed the results in a draft term sheet. (Doc. 188-5 at 2; Doc. 198-4 ¶ 14.) Georgiou responded with handwritten comments. (Doc. 188-5 at 2; Doc. 212-4 at 48.) When Jordan joined the exchanges, he consolidated Ruthen's terms and Georgiou's comments into a typewritten, "clean version." (Doc. 212-4 at 48.) This was the final Term Sheet—the alleged deceptive device. (Doc. 198-9 at 22; Doc. 212-4 at 48; Doc. 198 at 30.)

Yet the Term Sheet didn't substantively alter Jordan and Georgiou's original terms. (*Compare* Doc. 188-5 at 2; *with* Doc. 198-9 at 22.). Nothing in Jordan's emails suggests that he exercised any final authority. (*See* Doc. 198-6 at 2–4; Doc. 198-8 at 2–3; Doc. 198-9 at 2; Doc. 198-10 at 2; Doc. 198-11 at 2.) The testimony confirms this. Georgiou described Jordan's role as "making changes as directed and providing them to the parties." (Doc. 212-4 at 48.) And Jordan testified that he only made "[v]ery slight . . . [c]larifications[.]" (Doc. 212-2 at 78.)

What's more, Jordan paid careful attention to Jordan and Georgiou's wishes. He tracked his minor changes using a word processor. (*See* Doc. 198-9 at 22.) Then, he solicited comments at least twice. (Doc. 188-4 at 1; Doc. 188-7 at 1.) Taken together, this evidence yields only one reasonable inference: Jordan only prepared the Term Sheet, without exercising final authority over the statements in it.

Georgiou sometimes speculates that Jordan exercised greater control.[13] By illustration, Georgiou avers "I do not know whether Jordan or Ruthen drafted the term sheet they proffered to me . . . but it is a fair assumption that they drafted it together." (Doc. 198-4 ¶ 15.) For one thing, Georgiou admits he lacks personal knowledge of Jordan's role, so the Court need not credit his assumption—and any others like it—as true. (*See id.*); *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("[A] court is not obligated to take as true testimony that is not based upon personal knowledge."). Even crediting the assumption, preparing a statement on another's behalf isn't enough to show final authority over its contents—as a matter of law. *See Janus*, 564 U.S. at 142–43; *In re Galectin Therapeutics*, 843 F.3d at 1272. Perhaps Jordan exercised greater authority than the record reflects. But Plaintiffs haven't introduced evidence of this authority. The only evidence reflects that Jordan prepared the Term Sheet and made minor, stylistic changes to it. (*Compare* Doc. 188-5 at 2; *with* Doc. 198-9 at 22.) Hence no jury could reasonably infer (or fairly assume) that Jordan was the maker of the statements in the Term Sheet.

### b. Omissions

Jordan also argues that he cannot be liable for omitting material facts from the Term Sheet. (*See* Doc. 199 at 6–8.) Just so. Unlike for the Nevada intentional and negligent misrepresentation claims, omissions don't help Plaintiffs.

Along with prohibiting outright misstatements, Rule 10b-5 also prohibits making a statement while omitting a material fact "necessary to make the statements made . . . not

---

[13] To be clear, Plaintiffs don't ever argue that Jordan did more than draft the Term Sheet. (*See, e.g.*, Doc. 198 at 32.) But Georgiou speculates in his affidavit and testimony that Jordan exercised greater control. (Doc. 198-4 ¶ 15; Doc. 212-4 at 48.) The Court addresses this contention on its merits, but only because the Court may not grant summary judgment without an independent review of the record. *See United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101–03 (11th Cir. 2004).

misleading." 17 C.F.R. § 241.10b-5. Yet this doesn't create a general duty to disclose all information material to a transaction. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Even a duty to disclose (such as an attorney's) doesn't necessarily render silence misleading. *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024). Instead, liability for omitting a material fact attaches only if its absence renders an affirmative statement misleading. *Id.* In other words "there is no liability for pure omissions." *Id.*[14] Because no reasonable jury could find that Jordan made the alleged misrepresentations in the Term Sheet, he cannot be liable for omitting information either.

### c. Conclusion: Federal Securities-Fraud Claim

In sum, no reasonable jury could find that Jordan made the alleged affirmative misstatements in the Term Sheet. If anyone made them, it was Ruthen. Nor can Jordan be liable for omitting information from the Term Sheet unless he made an affirmative false statement—which he didn't. Hence Plaintiffs have failed to introduce evidence that shows that Jordan was the "maker" of a misstatement—a requirement for Rule 10b-5 liability. *See Janus*, 564 U.S. at 142–43. The Court thus grants Jordan summary judgment on the Rule 10b-5 claim.

### 2. Georgia Securities-Fraud Claim

Because the Georgia securities-fraud statute mirrors Rule 10b-5, the Georgia claim under O.C.G.A. § 10-5-58(b) fails too. The Georgia securities statute uses the same language as Rule 10b-5, so they have the same requirements. *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 537 S.E.2d 677, 681–82 (Ga. Ct. App. 2000). Plaintiffs must therefore show that Jordan made an affirmative misstatement. *Id.* Just like the Rule 10b-5 claim, a reasonable jury couldn't find that he did.

Plaintiffs try to set the Georgia claim apart from the other securities claims by arguing that derivative liability under § 10-5-8(b) is broader than Rule 10b-5. (*See* Doc. 192 at 26;

---

[14] This is distinguishable from the Nevada misrepresentation claims. Those claims allow liability for Jordan's omissions alone, based on his alleged fiduciary relationship with Georgiou. *See Nelson*, 163 P.3d at 426. By contrast, a Rule 10b-5 claim doesn't allow liability for Jordan's omissions because they didn't render any affirmative statement misleading. *See Macquarie Infrastructure*, 601 U.S. at 264.

Doc. 198 at 32.) Specifically, that "[u]nlike the federal securities laws, [the Georgia securities laws do not] require that the violator be a 'control person.'" (Doc. 198 at 32.)[15] They cite no authority. (*See id.*) And they misstate the law in any event.

While Rule 10b-5 doesn't allow aiding-and-abetting claims, it assigns liability to those who "control[]" a primary violator. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Georgia law imposes control-person liability too, with nearly identical statutory language. *Compare* 15 U.S.C. § 78(a) *with* O.C.G.A. § 10-5-58. So courts rely on federal authority to analyze Georgia control-person liability. *See Curry v. TD Ameritrade, Inc.*, No. 1:14-CV-1361, 2015 WL 11251449, at *18 (N.D. Ga. June 30, 2015) (citing *Binder v. Gordian Sec., Inc.*, 742 F. Supp. 663, 667 (N.D. Ga. 1990)). Hence Jordan will be liable as a control person only if Plaintiffs show that (1) Ruthen was a primary violator, (2) Jordan "had the power to control [Ruthen's] general business affairs[,]" and (3) Jordan had the power to "directly or indirectly control or influence the specific corporate policy which resulted in primary liability." *See Mizzaro*, 544 F.3d at 1237.

But no reasonable jury could find that Jordan controlled Ruthen. The undisputed evidence reflects that Jordan represented Ruthen personally and represented his businesses. (*See* Doc. 188-1 at 1–2; Doc. 198-15 at 2–7.) In this role, Jordan followed Ruthen's direction. (*See* Doc. 212-3 at 125, 128, 132, 158.) When he drafted the alleged securities offering, Jordan made only minor, stylistic changes. (*Compare* Doc. 188-5 at 2; *with* Doc. 198-9 at 22; *see* Doc. 212-3 at 112; Doc. 212-4 at 41, 48.) Plaintiffs haven't introduced any evidence to the contrary. (*See* Doc. 198 at 31–34.) Hence no reasonable jury could find that Ruthen was a control person under § 10-5-58(g).

So, a § 10-5-58(b) claim requires the same elements as a Rule 10b-5 claim. Plaintiffs cannot show a genuine dispute whether Jordan had the ultimate authority over the alleged misstatements in the Term Sheet. Hence the Georgia securities claim fails too. Plaintiffs

---

[15] Admittedly, it is unclear whether Plaintiffs assert derivative liability at all. Yet Plaintiffs invoke the "control-person" language, so the Court assesses the claim on its merits.

attempt at derivative liability (if any) doesn't change that conclusion. The Court thus grants summary judgment to Jordan on the Georgia securities-fraud claim.

*3. Nevada Securities-Fraud Claim*

The Nevada securities claim yields the same result. Nevada law creates a private right of action against the seller of a security who "[m]ake[s] an untrue statement of a material fact or omit[s] . . . a material fact necessary . . . to make the statements made not misleading[.]" NRS § 90.570(2). This language is familiar, of course, because it mirrors Rule 10b-5 and § 10-5-58(b). *See Shivers v. Amerco*, 670 F.2d 826, 831 (9th Cir. 1982). So federal courts apply federal securities-fraud principles to NRS 90.570(2). *See Shivers*, 670 F.2d at 831; *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1123 (D. Nev. 1998). The Court's review of Nevada authority confirms this approach. *See Sec'y of State v. Tretiak*, 22 P.3d 1134, 1139–40 (Nev. 2001) (relying on federal securities law to hold that reliance and scienter are not required elements in an NRS 90.570(2) state-enforcement action); *State v. Friend*, 40 P.3d 436, 439–440 (Nev. 2002) (applying the federal, family-resemblance test to analyze whether a promissory note was a regulated security under Nevada law).

Thus, the Court construes the term "maker" in NRS 90.570(2) to mean what it does in Rule 10b-5. So to prove their NRS 90.570(2) claim, Plaintiffs must show that Jordan exercised the ultimate authority over the alleged misstatements. *See Janus*, 564 U.S. at 143. But, as discussed, Plaintiffs have failed to produce sufficient evidence that Jordan did. Hence the Court grants summary judgment on the Nevada securities claim as well.

*4. Conclusion: Securities-Fraud Claims*

Consequently, each securities-fraud claim fails. No reasonable jury could find that Jordan made the alleged misstatements in the Term Sheet, and Jordan cannot be liable for pure omissions under Rule 10b-5. So that claim fails. And because the state-law-securities-fraud claims have the same requirements, they too fail. The Court thus grants summary judgment to Jordan on each securities-fraud claim. This renders Plaintiffs' arguments for summary judgment on the claims moot.

### F. Elder Abuse Claims

Lastly, Jordan moves for summary judgment on the elder-abuse claims. Plaintiffs assert an elder-abuse claim under NRS. 41.1395 and a negligence *per se* claim based on a Georgia criminal statute. Jordan isn't entitled to summary judgment on either.

#### 1. Nevada Elder Abuse

Nevada law provides a cause of action against a person who exploits an "older person" who loses money as a result. NRS 41.1395. Jordan challenges both that Georgiou fits the definition of an older person, and that Plaintiffs can show exploitation.

#### a. Older Person

An older person is someone 60 years or older. NRS 41.1395(d). Jordan concedes that Georgiou is over sixty. (*See* Doc. 189 at 18.) Yet he seems to argue that Georgiou's sophistication excludes him from the elder-abuse statute's protection. (*See id.*) To be sure, an elder-abuse claim seems an odd fit. As Jordan points out, Georgiou is a sophisticated lawyer and investor, who is quite unlike most victims in Nevada elder-abuse cases. *See Melton v. Lawson*, No. 88356-COA, 2025 WL 1889463, at *2, *5 (Nev. App. July 8, 2025) (defendant who coerced his elderly neighbor into quitclaiming her home to him when she was unable to take care of her basic needs); *Scrase v. Scrase*, No. 222CV01207, 2023 WL 3984764, at *1–3 (D. Nev. May 12, 2023) (sister alleged that her brother manipulated their vulnerable, elderly mother into transferring the mother's home to him).

Still, the text of NRS 41.1395(d) prescribes a strict inquiry: if a person is sixty years or older then the statute protects them. So Plaintiffs don't need show that Georgiou was vulnerable to prevail. Jordan's protests about Georgiou's sophistication thus add little.

#### b. Exploitation

Jordan next argues that Georgiou cannot show exploitation. (Doc. 189 at 18–19.) The Court disagrees. To show exploitation, Plaintiffs must establish that (1) Jordan had Georgiou's trust or confidence, (2) Jordan acted to obtain control over Georgiou's money, assets or property, through deception, intimidation or undue influence, or Jordan converted Georgiou's money or assets; and (3) with the intent to permanently deprive Georgiou of his assets. *See Carroll v. R.J. Nelson, Inc.*, 2021 WL 6143732, at *8, 501 P.3d 470 (Nev. App. Dec. 29, 2021)

(unpublished decision). Plaintiffs have introduced sufficient evidence that Jordan exploited Georgiou.

### i. Trust or Confidence

For the first element, sufficient evidence exists to show an attorney-client relationship between Jordan and Georgiou, and through this relationship Georgiou trusted Jordan. A fiduciary relationship is one of trust and confidence. *Reynolds v. Tufenkjian*, 2020 WL 6882914, at *3, 475 P.3d 777 (Nev. Nov. 23, 2020) (unpublished decision). An attorney-client relationship is fiduciary. *Williams v. Waldman*, 836 P.2d 614, 618 (Nev. 1992). Just like with Georgia law, Plaintiffs have introduced sufficient evidence to imply an attorney-client relationship between Jordan and Georgiou under Nevada law. *See Todd v. State*, 931 P.2d 721, 725 (Nev. 1997) (discussing implied attorney-client-relationship factors). So the existence of an attorney-client relationship suggests that Georgiou trusted Ruthen.

Beyond the attorney-client relationship, Plaintiffs point to testimony that Georgiou actually trusted Jordan. Georgiou relied on Jordan's "legal advice and his drafting of the agreement to reflect our understanding." (Doc. 212-4 at 59.) He also relied on Jordan to recognize "that he owed me a duty as a lawyer, as a member and sole manager of [BHR]. That's what [Georgiou] believed." (*Id.* at 76.) Of course, this testimony might be self serving. But Georgiou's sworn, self-serving statements are enough to create a genuine factual dispute. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (en banc).

Thus, Plaintiffs offer evidence that Jordan and Georgiou had an attorney-client relationship, and that this relationship caused Georgiou to trust Jordan. From this, a reasonable jury could find that Jordan had Georgiou's trust and confidence.

### ii. Control through Deception

For the second element, Jordan's omissions of material facts are sufficient to show a genuine dispute. As discussed previously, Jordan knew Ruthen and Suncrest Stone's financial condition might render them unable to perform as Georgiou expected. (*See* Doc. 188-1 at 1–2; Doc. 198-15 at 3–7; Doc. 198-16 at 3–4; Doc. 212-2 at 31; Doc. 212-3 at 109, 140–141.) Yet Jordan didn't tell Georgiou. (*See* Doc. 198-6 at 2–4; Doc. 198-8 at 2–3; Doc. 198-9 at 2; Doc. 198-10 at 2; Doc. 198-11 at 2.) Instead, Jordan prepared investment materials that

omitted this critical information. (*See* Doc. 188-5 at 1; Doc. 188-6 at 1; Doc. 198-9 at 2–23.) Jordan then transmitted the materials to Georgiou and, in the same email, asked Georgiou to wire the downpayment to the Coleman Talley trust. (Doc. 198-10 at 2.) Georgiou did so, placing the money in Jordan's control. (*See* Doc. 188-8 at 1; Doc. 212-4 at 47, 60.) In other words, Plaintiffs have introduced evidence that Jordan deceived Georgiou, which gave Jordan control of his assets. This is sufficient to submit the second element to a jury.

### iii. Intent to Permanently Deprive

For the third element, Plaintiffs have introduced evidence that Jordan deliberately concealed the status of the investment and removed the Shaw Factory from Georgiou's control. This permits the reasonable inference that Jordan intended to permanently deprive Georgiou of his assets.

Jordan ensured that Georgiou wouldn't learn about the status of his investment. After the Shaw Factory deal closed, Jordan ceased contact. (*See* Doc. 198-11 at 2; Doc. 212-2 at 42, 50, 79–80.) Suncrest Stone never occupied the factory and filed for bankruptcy. (Doc. 212-3 at 135–36, 139–41; Doc. 198-41 at 1–24.) But Jordan didn't tell Georgiou. (Doc. 212-2 at 42; Doc. 212-3 at 137–41.) Instead, Jordan concealed the status of Georgiou's investment from him. When Shaw sent default notices, Jordan directed Shaw to send further notices to Coleman Talley's address—rather than to Georgiou as BHR's registered agent. (Doc. 198-19 at 2; Doc. 212-2 at 69–70; Doc. 212-3 at 144, 147.) This meant that Georgiou didn't discover Ruthen's default. (Doc. 212-2 at 79–80; Doc. 212-4 at 79.)

Jordan also actively worked to deprive Georgiou of his assets. Namely, title to the Shaw Factory. (Doc. 212-4 at 79.) In exchange for his investment, Georgiou expected to become part-owner and managing member of BHR, which in turn, would hold the Shaw Factory title. (*Id.*) But Jordan dissolved BHR "extinguish[ing] Georgiou's past investment and [his] future interest in the factory" (as Georgiou put it). (*Id.* at 77.) Then, Jordan helped Ruthen execute an instrument which reverted title to the factory back to Shaw. (*See* Doc. 212-2 at 67; Doc. 198-14 at 2–21.)

So, Plaintiffs have introduced evidence that Jordan concealed the status of Georgiou's investment, and worked to deprive him of the asset he purchased with his downpayment.

33

From this, a reasonable jury could find that Jordan intended to permanently deprive Georgiou of his assets.

### c.  Conclusion: Elder Abuse

In sum, Georgiou was sixty years or older at the time of the alleged abuse, so he is protected by the Nevada elder-abuse statute. And Plaintiffs can show a genuine factual dispute over each element required to establish exploitation. The Court thus denies summary judgment on the Nevada elder-abuse claim.

*2. Negligence* Per Se

Jordan moves for summary judgment on the negligence *per se* claim. (Doc. 189 at 19–20.) The negligence *per se* arguments are confusing, as the Court will outline. (*See id.*; Doc. 198 at 24–26.) The Court attempts to tease them out and address them even so. In the end, the Court denies summary judgment.

The Amended Complaint alleges that Jordan was negligent as a matter of law because he violated a Georgia criminal statute prohibiting elder abuse. (Doc. 142 ¶¶ 174–78 (citing O.C.G.A. § 16-5-102)). Understandably relying on this, Jordan asserts a detailed (if misguided) argument that he didn't violate the criminal statute. (Doc. 189 at 19.) Yet Plaintiffs pivot in their Response. (*See* Doc. 198 at 24–26.) Now, they argue that "the facts supporting [their] negligence per se claim are premised on Jordan's violation of" the Nevada civil-elder-abuse statute (NRS 41.1395). (Doc. 198 at 26.) So they seek *per se* liability flowing from a Nevada civil statute, when they pleaded *per se* liability based on a Georgia criminal statute.

Jordan objects, and rightly so. (*See* Doc. 200 at 4–6.) Plaintiffs may not use their brief opposing summary judgment to amend their complaint. *See MSP Recovery Claims, Series LLC v. United Auto. Ins.*, 60 F.4th 1314, 1319 (11th Cir. 2023). Jordan is "not required to infer all possible claims" that might arise from the allegations and attempt to respond. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1194 (11th Cir. 2021). Instead, Plaintiffs should have moved to amend their complaint to assert the new theory. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). They didn't. So the Court considers only the pleaded legal theory: a negligence *per se* claim based on O.C.G.A. § 16-5-102.

This objection is distinguishable from Jordan's other challenge to the allegations. For the federal securities-fraud claim, Jordan effectively asserts a failure-to-state-a-claim defense.

(*See* Doc. 189 at 10–12.) That is, Jordan argues that the Rule 10b-5 claim fails because Plaintiffs haven't met the heightened pleading standard for federal securities claims. (*Id.*) The time to make that argument is over. But for the negligence *per se* claim, Jordan has a point. Plaintiffs state one negligence *per se* theory in their pleading, and rely on another to prevent summary judgment. (*Compare* Doc. 142 ¶¶ 174–88; *with* Doc. 198 at 24–26.) They may not do so.

Still, this presents another issue: Plaintiffs don't defend their pleaded negligence *per se* theory. (*See* Doc. 198 at 24–26.) Even so, the Court may not grant summary judgment for this reason alone. *See United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101–03 (11th Cir. 2004). Instead, it must independently assess the merits of Jordan's summary-judgment motion after reviewing the record. *See id.* So the Court examines the Georgia-criminal-law theory on its merits.

Jordan makes only one argument against the claim, and it's a non-starter. Jordan claims that § 16-5-102 applies only to a "guardian or other person supervising the welfare of or having immediate charge, control or custody of a[n] elderly person." (Doc. 189 at 19 (quoting O.C.G.A. § 16-5-101(a)). The problem is: that quote is from a different statute.

To be sure, § 16-5-101(a), makes it a felony for the guardian or caretaker of an elderly person to neglect that person. But the statute Plaintiffs plead, § 16-5-102, has no such restriction. It protects any "disabled adult, elder person, or resident" from exploitation by "any person." § 16-5-102(a). Georgia enacted § 16-5-102 to "provide[] additional protections for elderly adults by moving relevant crimes against [those adults] into the criminal code section most frequently used by law enforcement." Ga. H.R. News Release, June 21, 2013. Indeed, Georgia courts frequently uphold convictions under § 16-5-102 beyond the caregiving context. *See Austin v. State*, 849 S.E.2d 689, 696–97 (Ga. Ct. App. 2020) (evidence sufficient where defendant exploited his elderly landlord by pretending to be an FBI informant); *Poole v. State*, 896 S.E.2d 602, 603–606 (Ga. Ct. App. 2023) (evidence sufficient where daughter stole items from her father's truck during his hospitalization).

So Jordan's reliance on § 16-5-101(a) is misplaced. The Georgia elder-abuse statute applies to "any person[.]" *See* § 16-5-102(a). That includes him. Having rejected Jordan's only argument, the Court denies summary judgment on the negligence *per se* claim.[16]

## V. CONCLUSION

Thus, after review, Jordan's Motion for Summary Judgment (Doc. 188) is **GRANTED**, in part and **DENIED**, in part. Plaintiffs' Motion for Partial Summary Judgment (Doc. 192) is **DENIED**. Plaintiffs cannot show a genuine dispute on the Rule 10b-5 claim and its Nevada and Georgia analogues. So the Court **GRANTS** summary judgment on each securities-fraud claim. But the Court leaves all others for trial.

The Court **NOTICES** the case for trial, which will take place during the October 2025 term in the Albany Division which begins on October 6. A separate order to file a proposed pretrial order will follow.

**SO ORDERED**, this 14th day of August 2025.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATESDISTRICT COURT**

---

[16] Jordan doesn't challenge the sufficiency of the evidence to sustain the elder-abuse claim. The Court will not assert this on his behalf.

36